**No. 24-2422**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

BOSTON MARKET CORPORATION, et al.,

Plaintiffs-Appellants

v.

KOCH FOODS, INCORPORATED, et al.,

Defendants-Appellees

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:16-cv-08637
The Honorable Thomas M. Durkin

## THE RESTAURANTS' STATEMENT OF POSITION
## PURSUANT TO THE COURT'S AUGUST 16, 2024 ORDER

Lori P. Lustrin
Robert W. Turken
Scott N. Wagner
BILZIN SUMBERG BAENA
PRICE & AXELROD LLP
1450 Brickell Ave., Suite 2300
Miami, Florida 33131-3456
Telephone:  305-374-7580
Facsimile:  305-374-7593
llustrin@bilzin.com
rturken@bilzin.com
swagner@bilzin.com

*Counsel for Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT ............................................................1

ARGUMENT .....................................................................................3

    A.    The District Court Refused to Consider the Evidence Establishing the Value of the Restaurants' Bid-Rigging Claims ..............................3

        1.    The Bid-Rigging Evidence Submitted to the District Court .......5

        2.    The Evidence of the Value of the Restaurants' Bid-Rigging Claims Submitted to the District Court ...................................16

        3.    The District Court Never Considered the Bid-Rigging Claims in its Fairness Analysis of the Koch and House of Raeford Settlements ................................................................17

    B.    The Class's Expert Confirmed in Striking Detail that the Bid-Rigging Claims and the Supply Reduction Claim Arise from Distinct Factual Predicates ...................................................................19

CONCLUSION ...................................................................................24

CERTIFICATE OF WORD COUNT AND COMPLIANCE WITH TYPE FACE AND TYPE STYLE LIMITATIONS ........................................26

CERTIFICATE OF SERVICE ...........................................................26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Elna Sefcovic LLC v. TEP Rocky Mountain LLC*,
   807 F. App'x 752 (10th Cir. 2020) ...............................................23, 24

*Nat'l Super Spuds, Inc. v. New York Mercantile Exchange*,
   660 F.2d 9 (2d Cir. 1981) .....................................................19, 20, 21

*Reynolds v. Beneficial Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ...................................................3

*Synfuel Techs., Inc. v. DHL Express, Inc.*,
   463 F.3d 646 (7th Cir. 2006) ...................................................3

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 23(e)(2)(D)........................................19

Pursuant to the Court's August 16, 2024 Order, the Restaurants respectfully submit this statement of position addressing the effect of this Court's Opinion in *Boston Market Corporation, et al. v. Mountaire Farms*, *et al.*, No. 24-1030 ("*Simmons* Appeal"), on this Appeal.  *See* Dkt. 4 (Order suspending briefing in this Appeal pending resolution of the *Simmons* Appeal).

## **PRELIMINARY STATEMENT**

Many of the legal questions raised in this Appeal overlap with those addressed in the *Simmons* Appeal.  However, because of the expanded evidentiary record in this Appeal, there are several critical differences that were not considered by the Court in the *Simmons* Appeal.

In the *Simmons* Appeal, this Court held that "the Boston Market group has not supplied any evidence that $8 million is an unreasonably low value for the released claims (including bid rigging)."  *Simmons* Opinion at 4.  The Restaurants presented this exact analysis to the district court in their objection to the Koch and House of Raeford settlements ("Koch and HOR Objection").

The Restaurants provided the district court with the Expert Report of Laurel C. Van Allen, an economist with extensive experience quantifying antitrust damages, to demonstrate the value of the released bid-rigging claims.  Appx. 0852 [D.E. 7281-1, Ex. 47].  Ms. Van Allen concluded that during just one year of the eight year bid-rigging conspiracy, the Restaurants' damages eclipsed the Class's

combined supply reduction only recovery from Koch and House of Raeford.  Appx. 0855 [*Id.* at 2].

The Restaurants also presented the district court with what the district court has since referred to as "strong" evidence establishing Koch's, House of Raeford's and the other Bid-Rigging Defendants' participation in the bid-rigging conspiracy.[1] Appx. 0047, Decl. of L. Lustrin submitted in support of Amended Objection to Koch and House of Raeford Settlements [D.E. 7281-1].

Yet, despite this presentation, the district court ruled that its assessment of the fairness of the settlements—which the Class admitted released the bid-rigging claims for *nothing*—did not require consideration of the value of the bid-rigging claims.  In fact, the district court determined that the Restaurants' "contention that the settlement does not provide fair value [for the bid-rigging claims] is a red herring[.]"  Appx. 0918, Koch and HOR Order [D.E. 7352 at 2].

The expanded evidentiary record in this Appeal also confirms that the Restaurants' bid-rigging claims arise from a completely different factual predicate than the Class's supply reduction claim.  In its effort to avoid the import of Ms. Van Allen's analysis, the Class presented the declaration of its expert, Dr. Colin Carter.

---

[1] On February 11, 2025, the district court denied all but one (Fieldale) of the Bid-Rigging Defendants' motions to dismiss the bid-rigging claims and held that "there are strong allegations that the Bid-Rigging Defendants communicated directly and expressly about rigging bids and fixing prices."  Appx. 0961 [D.E. 7501 at 34].

Dr. Carter's declaration proves that the Restaurants' bid-rigging claims are based on the purchase of different products, during a different time period, and from different defendants than the Class's supply reduction claim. Appx. 0875 [D.E. 7318].

For these reasons, the district court's Order approving the Koch and House of Raeford settlements should be reversed.

## **ARGUMENT**

### A.    The District Court Refused to Consider the Evidence Establishing the Value of the Restaurants' Bid-Rigging Claims

The district court's failure to conduct any valuation analysis of the bid-rigging claims violates the most fundamental aspect of the fairness and reasonableness inquiry required of district courts to approve a class settlement. *Synfuel Techs., Inc. v. DHL Express, Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) ("The most important factor relevant to the fairness of a class action settlement" is "the strength of plaintiff's case on the merits balanced against the amount offered in the settlement."); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280 (7th Cir. 2002) (district court "did not give the issue of the settlement's adequacy the care that it deserved.").

In its Order denying the Restaurants' objection and granting final approval of the Simmons settlement ("Simmons Order"), the district court ruled that it was the Restaurants' burden to show that the Simmons settlement was unfair and that the Restaurants did not support the value of their bid-rigging claims "with evidence or more sophisticated argument." Appx. 0009-10 [D.E. 7083 at 9-10]. Specifically,

the district court stated that it "cannot find that the settlement does not provide a substantial recovery without some analysis as to how the recovery amount fails to fairly compensate the Class for releasing their claims, including the bid-rigging claims." Appx. 0007 [*Id.* at 7].

The district court then concluded that the value of the bid-rigging claims was appropriately taken into account by the Class in connection with the Simmons settlement:

> [T]he Class's concession that the bid-rigging claims were not a 'focus' of settlement negotiations does not mean the value of those claims was not considered, and certainly not that they were released for 'nothing.' All parties in this case were well aware of the bid-rigging claims and their potential merits and value.

Appx. 0007-08 [*Id.* at 7-8]. The district court continued that if the Restaurants believed that their bid-rigging claims were not properly valued, they were required to "argue what an appropriate recovery amount would have been" to account for that value. Appx. 0007 [*Id.* at 7].

As part of their Koch and HOR Objection, the Restaurants submitted precisely what the district court said was lacking in their objection to the Simmons settlement: (i) detailed evidence of Koch's, House of Raeford's and the other Bid-Rigging Defendants' conspiratorial conduct; and (ii) an analysis of the damages that the Restaurants suffered as a result of the bid-rigging conspiracy. The presentation was submitted without the benefit of any bid-rigging discovery, which the district court

had stayed after agreeing with the defendants that bid-rigging was not relevant or admissible with respect to the Class's Track One supply reduction claim.  D.E. 6819 at 55-56.

Even without discovery, the direct evidence of the bid-rigging conduct that the Restaurants presented to the district court in support of their Koch and HOR Objection was overwhelming.  Moreover, the $118 million in single damages that Ms. Van Allen determined were suffered by the Restaurants for just one year of the bid-rigging conspiracy exceeded the combined $75 million Koch and House of Raeford settlements for the entire Class during the entire supply reduction period. Appx. 0922, Final Approval Order [D.E. 7356].

1.     The Bid-Rigging Evidence Submitted to the District Court

On June 2, 2020, the DOJ indicted officers of Bid-Rigging Defendants Pilgrim's and Claxton.  The June 2020 Indictment implicated Bid-Rigging Defendants Koch, Tyson, Case, George's and Mar-Jac and charged the named officers of Pilgrim's and Claxton with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act.  Appx. 0047, Decl. of L. Lustrin and Exhibit Index submitted in support of Amended Objection to Koch and House of Raeford Settlements [D.E. 7281-1], Appx. 0385 [Ex. 5] at ¶1.

Following the Indictment, Tyson admitted that it participated in bid-rigging and price-fixing conduct.  It issued a statement that it "uncovered information in connection with that investigation, which we immediately self-reported to the DOJ. Tyson took appropriate actions to address the internal issues and has been fully cooperating with the DOJ as part of its application for leniency under the DOJ's Corporate Leniency Program."  Appx. 0409 [Ex. 6].

On October 6, 2020, the DOJ filed a Superseding Indictment charging six additional executives—including Bill Kantola, Senior Vice President of Koch—and expanding the criminal conspiracy period from 2012 through early 2019.  Appx. 0412 [Ex. 7].

In February 2021, Pilgrim's Pride pled guilty to "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."  Appx. 0468 [Ex. 8 at 3].  Pilgrim's admitted that "[f]rom at least as early as 2012 and continuing through at least early 2017," Pilgrim's participated in a conspiracy "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for certain broiler chicken products sold in the United States."  Appx. 0469 [*Id.* at 4].  Pilgrim's was assessed a fine of $107.9 million.  *United States v. Pilgrim's Pride Corp.*, No. 1:20-cr-00330-RM (D. Colo.), D.E. 60.

At the criminal trial of Kantola (Koch) and nine of his co-conspirators, former Pilgrim's employee Robbie Bryant admitted that the bid-rigging conspiracy occurred and that the conspirators used pricing to KFC as the platform to effectuate price increases when bidding on other large Quick Service Restaurants' ("QSRs") contracts, including the Restaurants' contracts:

> Q:  And I think that you also testified that – did the plan to raise prices apply just to KFC?
> A:  No.
> Q:  What else did it apply to?
> A: The rest of the QSR business and other customers that we serviced out of the small bird.
>                                    ***
> Q:  But I mean when I said such as, I meant QSRs such as what?
> A: *KFC, Popeye's, Church's and* [Objector] *Bojangles.  The goal was to get price increases from all of them.  "*
> *Q:* [Objector] *Boston Market?*
> *A: Yes.*

Appx. 0500-02 **[**Ex. 9 at 11/2/21 at 192-94]; *see also* Appx. 0503 and 0497 [Ex. 9 at 11/2/21 Tr. at 215 and 11/1/21 Tr. at 163].[2]

Bryant further testified that he witnessed his boss, Jason McGuire (Pilgrim's Exec. VP), ask Roger Austin (Pilgrim's VP) to share information with competitors in order "to build support with competitors to raise prices in the 2014 bid season" and that he witnessed calls between Austin and Scott Brady (Claxton VP) and Kantola (Koch).  Appx. 0493-96 [Ex. 9 at 11/1/21 Tr. at 35, 69-70, 77].

---

[2] Unless otherwise noted, all emphasis is added.

The documentary evidence produced during the criminal trial corroborates Mr. Bryant's account and shows the repeated exchanges of confidential information among the defendants to increase prices to contract-based QSR customers like the Restaurants.  Appx. 0505 and 0519 [Ex. 10 and 11].

For example, in his August 18, 2014 cover email to Jason Penn (Pilgrim's CEO) transmitting a competitor pricing spreadsheet, Jason McGuire (Pilgrim's) wrote "Roger [Austin of Pilgrim's] did some checking around today and I included the below regarding the range of the total increases (margin and costs) folks are going in with.  *Koch .14-.16/lb* [,] Case .13-.15/lb [,] Claxton .14-.16/lb [,] Georges .15-.17/lb . . . [,] Marjac .14-.16/lb."  Appx. 0578 [Ex. 12].

The result of the Bid-Rigging Defendants' conspiratorial exchanges was a price increase to KFC for the 2015-2017 contract period that yielded Koch and other Bid-Rigging Defendants an inflated margin on the KFC 8-piece.  Appx. 0580-94 [Exs. 13-17].  Koch in particular raised its prices to KFC by *.$22/lb*.  Appx. 0596 [Ex. 18]; *see also* Appx. 0595 [Ex. 17] (Brady texts Fries "*Koch is not moving either*"; "Roger and *bill [Kantola] are not moving*.").

As Mr. Bryant testified, the Bid-Rigging Defendants used the price increase to KFC to negotiate increases with QSR chains, like the Restaurants, who put their contracts out to bid.  Objectors Boston Market and Golden Corral were early targets.  On September 19, 2014, Jimmie Little (Pilgrim's Sales Director) and Tim Stiller

(Pilgrim's GM) had the following exchange after a significant price hike to Objector

Boston Market:

> Little:  They've [Boston Market] agreed to 2015 pricing. Case weights
> will move to previous quarters actual.
> Stiller [forwarding to Justice]:  FYI .17/lb.
> Justice:  + I hope
> Stiller:  Haha yes
> Justice:  Awesome Now can Hannaford pay us more?
> Stiller:  One at a time.  *Got KFC and BM [Boston Market]. Rest still to
> come. Everybody is getting that price increase.*
> Justice:  Yahoooo

Appx. 0599 [Ex. 19].

The same day, Stiller forwarded Little's email confirming the price increase

to Objector Boston Market to Jason McGuire (Pilgrim's).  Appx. 0601 [Ex. 20].

McGuire forwarded the email to Brenda Ray (Pilgrim's) and said "FYI, this is about

.17-.18/lb. Done deal."  Appx. 0602 [*Id.*].  Ray responded "*What are we going to

GC [Golden Corral] with*? Same +.18-.19/lbs? I will have Ken work w/same for

Sonny's."  *Id.*  Stiller responded, "We will have GC and Sonny's pricing to you in

the next 10 days or so.  *GC will be much higher.*"  *Id.*  McGuire responded, "*GC will

be MUCH higher. Probably looking around a .40/lb number, we are just courtesy

bidding.*"  Appx. 0603 [Ex. 21]; *see* Appx. 0605 [Ex. 22].

Bid-Rigging Defendants Pilgrim's, Tyson and Mar-Jac thereafter coordinated

and submitted their 2015 bids to Objector Golden Corral.  On October 8, 2014, Stiller

asked Scott Tucker (Pilgrim's): "Anything from your buddies at GC [Golden

Corral]?"  Tucker responded, "Not a peep.  *I talked to MJ [Mar-Jac] today and they've not heard anything either*."  Stiller asked: "*Interesting…was their pricing similar*?"  *Id.*  Tucker confirmed, "*Very. Others were higher*."  Appx. 0607 [Ex. 23]; *see also* Appx. 0609-11 [Exs. 24-25].

On November 9, 2014, Penn informed Bill Lovette (Pilgrim's CEO): "I raised OK [Golden] Corral 15c per lb" and "*Telly Smith [(Golden Corral)] and his crew will pay market price plus the special A-Hole Premium*."  Appx. 0613 [Ex. 26].  On November 12, 2014, Craig Kasmier of Pilgrim's emailed Jason Penn and said "Rumor has it that Marjac went up 19 cents per lb on bid for the Golden Corral next year."  Appx. 0617 [Ex. 27].  Penn responded, "*Not a rumor*."  *Id.*; *see also* Appx. 0621 [Ex. 28 at 34] (Golden Corral VP of Purchasing testified that his "general reaction was one of sticker shock.").

As Mr. Bryant testified, Objector Bojangles was also a direct target of defendants' coordinated price increases.  Appx. 0500-01 [Ex. 9 at 11/2/21 at 192-93].  On December 17, 2013, Slider emailed McGuire: "Just FYI. I have not finalized anything with Keith [Rosenthal VP of Bojangles] yet, but we are supposed to talk later this afternoon.  *Here is what I have been able to find out*….George's locked in at $0.9150 FOB[,] Durbin has not finalized anything yet, but have presented $0.93 and will go to $0.9250 if they have to[,] Claxton has not finalized anything yet, but it looks like they will settle at the $0.92-$0.9250 range."  Appx. 0623 [Ex. 29].

Slider continued, "*The George's price is what Keith is looking to get from everybody, but that will not happen . . . based on what I have been told.*" *Id.*

The following bid season, Slider observed, "Wow. Price just went higher for 2015." Tucker responded, "Everybody will be paying through the nose. KFC will be paying close to $.30 between price increase and case weight increase." Slider responded, "Good. Get it while we can!! *What is the proposed price on Bojangles' for next year?*" Tucker responded, "We haven't started talking about it yet. *Once KFC is inked, we'll be hitting these others starting next week.*" Appx. 0627 [Ex. 30].

In September 2014, Tench (Mar-Jac) prepared a summary touting the substantial across-the-board price increases Mar-Jac was attempting to achieve for the 2015 season in negotiations with their largest bid customers, including KFC, Popeye's, Church', and Objectors Bojangles, Golden Corral and El Pollo Loco. Tench continued, "[w]ith all planned increases [to customers] in place, *Mar-Jac will net approximately $400,000 additional profit per week*." Appx. 0630 [Ex. 31].

In its sales status report in connection with its December 2014 Board Presentation, Mar-Jac summarized the final price increases Mar-Jac achieved for its major fast food customers, which met—and in some instances exceeded—Tench's September projections. The report reflected the following results: Objector Bojangles (15 cent increase); Objector EPL [El Pollo Loco] ($0.2075 increase on splits, $2,158,000 annual increase); Objector Golden Corral (19 cent increase on 8

pc, $1,185,600 annual increase); Church's (16 cent increase, $1,040,000 annual increase).  Appx. 0682 [Ex. 33]; *see also* Appx. 0632 [Ex. 32].

The bid-rigging conduct targeted at the Restaurants continued into the 2015 season.  On June 9, 2015, Carl Pepper (Tyson Nat'l Sales Mgr) emailed Little (Pilgrim's) with the subject *Boston Market*.  Pepper asked "You got any idea what your next qtr billing weight will be."  Little responded "56.70."  Pepper replied, "We are 56.97."  Little answered, "Close enough."  Appx. 0725 [Ex. 34].

On September 3, 2015, Kantola (Koch) emailed Joe Grendys (Koch CEO) regarding "*Golden Corral RFP*."  Kantola wrote "*I sent you the chart reflecting my best pricing intel this a.m.*"  Appx. 0728 [Ex. 35].  On September 29, 2015, Lee Moriggia of Golden Corral asked Tucker if Pilgrim's could supply Golden Corral with a 9-piece cut up with extra dark meat.  Tucker then forwarded Moriggia's request to Stiller and Austin.  Stiller responded, "*What are we hearing from others*?"  Tucker responded, "*MarJac will do it to keep the business*."  Appx. 0730 [Ex. 36]; *see also* Appx. 0745 [Ex. 39].

On July 1, 2015, Jason Lee (House of Raeford Sales Mgr) wrote regarding House of Raeford's talks with competitors Wayne and Amick on prices.  Lee wrote, "[w]e have talked to Wayne Farms, they're -09[.]  We have also talked to Amick and I just called them back again to confirm, they didn't sell a lb. for less than -06 into NY this week or next."  Windham (House of Raeford) said, "*I don't think we*

*should mention talking to our competition about pricing. That's just a little illegal. Just sayin*.'"  Appx. 0733 [Ex. 37].

On November 12, 2015, Tucker (Pilgrim's) emailed Stiller and Austin regarding pricing to Golden Corral.  Tucker wrote, "I know MarJac is sitting at $0.86 delivered on wogs and 9 piece and about $0.42 on dark meat for Cordele and Lakeland.  They are under the impression they'll keep their [Golden Corral's] business."  Appx. 0744 [Ex. 40].

On December 10, 2015, in a text, Lovette (Pilgrim's CEO) observed, "With us [Pilgrims] taking [M]ayfield to [C]ostco/cfa and MJ [Mar-Jac] going [t]o CFA into one of their plants.  We should be positioning ourselves to dictate price again during negotiations for 2017."  A Pilgrim's employee responded "*Those guys (QSR) will have their jaws dropping*."  Appx. 0752 [Ex. 41].

Defendants' conspiratorial conduct continued to elevate pricing to the Restaurants and other victims through at least 2019.  *See* D.E. 5455 (Sec. Am. Cons. Cmpl.) at ¶¶1037-71.  For example, On September 13, 2016, Kantola (Koch) emailed Eric Loeffler (Koch Sales Mgr) in advance of providing Church's with 2017 pricing.  Kantola wrote, "*Can you get some intel on competitive pricing*."  Loeffler responded, "Let me see what I can find out."  And on October 4, 2016, Tucker (Pilgrim's) texted Stiller (Pilgrim's) "Told Lee [Morrigia (Golden Corral)] I needed

until noon tomorrow. *Have a message in for Grindle [Mar-Jac]*." Appx. 0757-59 [Exs. 42-43].

Similarly, on January 19, 2017, Jody Smith (Wayne Sales Mgr) sent an email to David Hand (Wayne Sales Director) and Lee Matthews (Wayne Mgr) with the subject "Pilgrims Seconds Price List 1-16-2017.xls" and attaching a spreadsheet containing Pilgrim's pricing to common customers, including Objector Zaxby's. Hand then forwarded it to Steve Clever (Wayne Sales VP) and said "*Pilgrims showing $.45 on their Zaxby downgrade*." Appx. 0761 [Ex. 44].

Based on this evidence, Chief Judge Brimmer found "*by a preponderance of the evidence*" that "[t]he government has shown that a conspiracy to rig bids and fix prices for broiler chicken products in the United States did exist and that such conspiracy operated between at least August 2011 and early 2019." Appx. 0777 [Ex. 45] at ¶1. Judge Brimmer also found, "*by a preponderance of the evidence*" that "the conspiracy included," Joe Grendys, William Kantola and Bruce MacKenzie of Koch. Appx. 0777-78 [*Id.*] at ¶2.

After the jury was unable to reach a verdict following the first trial, Judge Brimmer went even further. In his order denying the criminal defendants' motion for judgment of acquittal, Judge Brimmer held that "[t]he testimony of government witness Robbie Bryant, a Pilgrim's Pride [] employee, is sufficient to support a finding *beyond a reasonable doubt* that a conspiracy existed between Pilgrim's,

14

*Koch Foods ("Koch")*, Claxton Poultry ("Claxton"), Tyson Foods ("Tyson"), Mar-Jac Poultry ("Mar-Jac"), and George's Inc. ("George's") [the corporations that employed the 10 criminal defendants] to rig bids and fix prices." Appx. 0826 [Ex. 46 at 6]. Judge Brimmer also found that "[t]he testimony of Mr. Bryant, viewed in the light most favorable to the government, is sufficient for a reasonable jury to find that *Mr. Kantola [(Koch)] joined the conspiracy by the time of the 2014 RSCS negotiations . . . with the intent to advance its goals*." Appx. 0838-39 [*Id.* at 18-19].

In its recent Order denying the Motions to Dismiss the bid-rigging claims, the district court specifically referred to Judge Brimmer's findings:

> [t]he communications alleged in the [Track Two bid-rigging] complaint in this case are largely the same communications that were the basis for the conspiracy finding by the court in the criminal case. While the criminal court's finding is not binding on this Court, *it is a highly persuasive opinion, especially considering that the preponderance standard is a higher standard than the plausibility standard Plaintiffs must satisfy here*.

Appx. 0937 [D.E. 7501 at 10]. The district court also referred to the evidence presented above and stated that "there are strong allegations that the Bid-Rigging Defendants communicated directly and expressly about rigging bids and fixing prices." Appx. 0961 [D.E. 7501 at 34].

Yet in its Order approving the Koch and House of Raeford settlements, the district court did not refer to or consider any of this evidence in evaluating the fairness of the settlements. This was clear error.

2.     The Evidence of the Value of the Restaurants' Bid-Rigging Claims Submitted to the District Court

To satisfy the concern articulated by the district court in its Simmons Order that "all the [Restaurants] have to offer [regarding the value of their bid-rigging claim] is conjecture," (Appx. 0010, Simmons Order at 10) the Restaurants retained Ms. Van Allen to provide an initial assessment of the damages suffered by the Restaurants as a result of the bid-rigging conspiracy.  She performed an analysis that focused on just one year of the bid-rigging conspiracy—comparing the prices paid by the Restaurants in 2015 to the prices they paid in 2014.  *See* Appx. 0852, Decl. of Laurel C. Van Allen [D.E. 7281-1, Ex. 47].

Ms. Van Allen's analysis showed that the prices the Restaurants paid for whole bird products in 2015 were *15 percent higher* than the prices charged to the Restaurants in 2014.   Appx. 0863-64 [*Id.*] at ¶20, Table 5.   Ms. Van Allen's examination also showed that the Restaurants experienced similar price increases for broiler chicken purchases apart from whole birds.  Appx. 0865-66 [*Id.*] at ¶23, Table 6.

Ms. Van Allen further stated that the price increases to the Restaurants in 2015 occurred at the same time that the market price for the same products *declined* by 17.7 percent.  Appx. 0866-67 [*Id.*] at ¶24, Figure 1.

Applying Ms. Van Allen's 15 percent overcharge—which does not consider the effect of the market-wide price decrease—to the Restaurants' $787 million in

purchases in 2015, results in damages to the Restaurants of over $118 million.  And this, of course, is for only one year of the eight-year bid-rigging conspiracy period, and before the trebling of damages after trial.

By itself, Ms. Van Allen's preliminary analysis demonstrates the significant marginal difference between the value of the settlements if they had included the Restaurants' bid-rigging claims as compared to the supply reduction only settlements that the Class admitted it negotiated with Koch and House of Raeford.

3.    The District Court Never Considered the Bid-Rigging Claims in its Fairness Analysis of the Koch and House of Raeford Settlements

As the Class admitted both before the district court and this Court, and as the district court confirmed, the Class never attempted to present a valuation of the bid-rigging claims to the district court.  In turn, the district court never considered the value of the bid-rigging claims when it granted approval of the Koch and House of Raeford settlements.  *See* Appx. 0922, Final Approval Order [D.E. 7356]; Appx. 0917, Koch and HOR Order [D.E. 7352].

In its brief before this Court in the *Simmons* Appeal, the Class argued that it and the district court did not have to consider whether class members received fair consideration for the release of the bid-rigging claims because (i) the Class had no obligation to the Restaurants and only to the Class "as a whole"; and (ii) the bid-rigging claims had no value to the Class "as a whole" but instead were "individual"

and "targeted and specific to the Restaurants."  *Simmons* Response Brief at 33, 45-47 [Case No. 24-1030, D.E. 51-1].

In its Simmons Order, the district court, again, dispelled that notion and recognized that settlement approval hinges on the Class receiving adequate consideration for all claims—including the bid-rigging clams.  Appx. 0007-08 [D.E. 7083 at 7-8].

But in its Koch and HOR Order, the district court did a complete about face. The district court acknowledged the evidence and valuation presented by the Restaurants at the district court's direction.  But the district court then held that the value of the bid-rigging claims was not even pertinent to its consideration of the fairness of the settlements.  Indeed, the district court dismissed the Restaurants' objection that the settlements did not provide fair value for the bid-rigging claims as a "red herring."  Appx. 0918, Koch and HOR Objection [D.E. 7352 at 2].

The district court first ruled that "[o]nce the Class gave notice that they would proceed on Track One, the Class was no longer litigating bid-rigging, so bid-rigging claims were not addressed on class certification."  Appx. 0919 [*Id*. at 3].  The district court then stated that "[t]he reason the bid-rigging claims were not addressed on class certification, and the *settlements here do not directly address the value of those claims*, is that the DAPs communicated to the Court and the parties in this case that they planned to proceed in Track Two."  Appx. 0919-20 [*Id*. at 3-4].

18

The district court compounded its failure to consider the value of the bid-rigging claims presented by the Restaurants in their Koch and HOR Objection by refusing to acknowledge the differences between the Restaurants' claims and the claims of the rest of the Class.  This result violates the express requirement of Rule 23(e)(2)(D) that the settlements must treat the Restaurants "equitably relative" to the other members of the Class who, unlike the Restaurants, did not have bid-rigging claims.[3]  *See also Nat'l Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 19 (2d Cir. 1981) ("Under the settlement a class member holding one liquidated and one unliquidated contract receives no more than another class member holding only one liquidated contract.  Mere statement suffices to show how far this departs from principles of equity.").

### B.     The Class's Expert Confirmed in Striking Detail that the Bid-Rigging Claims and the Supply Reduction Claim Arise from Distinct Factual Predicates

In an attempt to neutralize Ms. Van Allen's assessment of the value of the Restaurants' bid-rigging claims, the Class offered the declaration of its expert, Dr.

---

[3] As the Advisory Committee Notes explain, "Paragraph (D) calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-a-vis others.  Matters of concern could include whether the apportionment of relief among class members *takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief*."

Carter.[4]  Appx. 0875 [D.E. 7318].  Dr. Carter's analysis is critical to this Court's

determination in this Appeal, but for a very different reason than the Class intended.

As the Restaurants explained to the district court, Dr. Carter crystalized in black and

white why the Restaurants' bid-rigging claims are completely distinct from the

Class's supply reduction claim so that they cannot be properly included within the

scope of the settlements' releases.  Appx. 0979-81 [D.E. 7341 at 11-13].[5]

      In his report, Dr. Carter did not attempt to offer an alternative valuation of the

Restaurants' bid-rigging claims.  The Class did not ask him to do so.  Instead, Dr.

Carter relegated his submission to a critique of Ms. Van Allen's analysis and

concluded that she "vastly overestimate[s] the relevant value of trade between

Defendants and Restaurants."  Appx. 0884 [D.E. 7318] at ¶6.

      To support his opinion, Dr. Carter referred to various restrictions that he

imposed to calculate the value of the Class's supply reduction only claim.  Dr. Carter

first took issue with Ms. Van Allen's inclusion of the Restaurants' purchases of

"*non-class products*" such as "*further processed products*," which Dr. Carter

---

[4] Like Ms. Van Allen's declaration, Dr. Carter's declaration was not included in the
record submitted in connection with the *Simmons* Appeal.

[5] The anomalous dips that the district court referenced in its summary judgment
order were the 2008-2009 and 2011-2012 decreases in chicken supply that serve as
the foundation for the Class's supply reduction only theory.  D.E. 6641.  These dips
(and corresponding price increases) pre-dated the bid-rigging conduct, which began
in 2012 and continued until 2019.  D.E. 5455.

observed account for "*over half of the amount of commerce reported by Ms. Van Allen*." Appx. 0884-85 [*Id.*] at ¶17. Dr. Carter stated these products should not be included because "due to the nature of the Restaurants' business, they are more likely to purchase further processed products *which are not included among the class products used in my reports to calculate damages.*" *Id.*

As Dr. Carter explained, "[i]n my Merits Report, my analysis was limited to only class products that met the definition of 'raw whole birds (with or without giblets), whole cut-up birds, or parts (boneless or bone-in) derived from the front half of the whole bird, for use or delivery in the United States.' I restrict my analysis to those broiler products that are 'minimally processed,' that is, excluding 'items that are cooked, partially cooked, breaded, etc.,' in order to 'only consider products for which I am confident I have adequate information to control for the costs associated with producing those products.' *This is consistent with the Direct Purchaser Plaintiff Class definition of class products which is limited to these categories of minimally processed broiler products.*" Appx. 0882[*Id.*] at ¶10.

This same limited scope of "class products"—that omits the further processed products that are the subject of the Restaurants' bid-rigging claims—is reflected in the definition of the "Certified Class" contained in (i) the district court's class certification order; (ii) the Koch and House of Raeford settlement agreements; (iii) the district court's orders preliminarily and finally approving the Koch and House

21

of Raeford settlements; and (iv) the notice sent to class members.  *See* D.E. 5644 (class certification Order) at 3; D.E. 7070 at ¶2 (Final Approval Order); D.E. 6928-1 at ¶5 (HOR settlement agreement); D.E. 6928-2 at ¶5 (Koch settlement agreement); D.E. 7174-2 at ¶5 (Notice).

Dr. Carter also contended that Ms. Van Allen's analysis improperly included purchases from Bid-Rigging Defendants who were dismissed from the supply reduction claim.  Appx. 0885 [D.E. 7318] at ¶18.  Dr. Carter asserted that Ms. Van Allen further overestimated the Restaurants' volume of commerce because she considered the Restaurants' purchases after May 2014.  According to Dr. Carter, Ms. Van Allen should have limited her analysis to the 2008-May 2014 supply reduction time period that the district court established in its summary judgment order.  Appx. 0885-86 [*Id.*] at ¶¶20-21.

In short, Dr. Carter confirmed that the Restaurants' bid-rigging claims are based on purchases of *different products*, during a *different time period*, and from *different defendants* than the Class's supply reduction only claim.[6]  As a result, the Restaurants' bid-rigging claims necessarily arise from different transactions and

---

[6] The Restaurants' purchases also were not included in Dr. Carter's reports that were the basis for the Koch and House of Raeford settlement discussions.  Appx. 0163 [D.E. 7281-1, Ex. 1] (8/31/21 Merits Rpt.) at ¶184 ("*I excluded the value of purchases made by those individuals and entities that have filed direct action lawsuits,*" like the Restaurants); *see also* Appx. 0307 [D.E. 7281-1, Ex. 2] (7/21/23 Supplemental Merits Rpt.) (submitted after the April 2023 opt out deadline based on the same purchases).

occurrences, which fall outside the class definition, and involve facts and evidence that could not have been the subject of the Class's case. *See, e.g., Elna Sefcovic LLC v. TEP Rocky Mountain LLC*, 807 F. App'x 752, 765 (10th Cir. 2020) ("When considering the permissibility of a release, the overlap between elements of *claims* is not dispositive. Instead, we focus on the factual predicate of the settled claims." (emphasis in original)).

This, of course, is in accord with the defendants' long-held position that the bid-rigging claims involve "totally different conduct during a later time period," and are "entirely distinct" from supply reduction such that the district court should "keep separate cases separate." D.E. 6708, 3688. It no doubt is for this reason that Koch and House of Raeford did not adopt the Class's factual predicate argument before the district court or this Court in connection with the *Simmons* Appeal.

It also is for this reason—the evidentiary differences between the two claims—that the district court refused to admit at the supply reduction only trial even the most direct evidence of the bid-rigging conspiracy. As one example, the district court refused to allow into evidence the 2015 email from Chan Windham of House of Raeford in which he stated "I don't think we should mention talking to our competition about pricing. That's just a little illegal." Appx. 0739 [D.E. 7281-1, Ex. 38 at 1119].

The district court determined that the email was inadmissible because it was referring to price-fixing, not coordinated supply reduction.  "I reviewed the transcript relating to it, and they're certainly not talking production." *Id.*

With the expanded record in this Appeal, the district court's conclusion that the Restaurants' bid-rigging claims and the Class's supply reduction claim arise from the same factual predicate cannot be sustained.  For this reason as well, this Appeal compels a different result than the Court reached in the *Simmons* Appeal.

## <u>CONCLUSION</u>

For each of these reasons, the Restaurants respectfully request that the Court reverse the district court's Order approving the Koch and House of Raeford settlements.

Dated:  April 15, 2025

Respectfully submitted,

By: <u>/s/ *Lori P. Lustrin*</u>
Lori P. Lustrin
Robert W. Turken
Scott N. Wagner
**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
1450 Brickell Ave., Suite 2300
Miami, Florida 33131-3456
Telephone:  305-374-7580
Facsimile:  305-374-7593
llustrin@bilzin.com
rturken@bilzin.com
swagner@bilzin.com

*Counsel for Boston Market Corporation, Bojangles' Restaurants, Inc. and Bojangles' Opco, LLC, Golden Corral Corp., El Pollo Loco, Inc., Zaxby's Franchising LLC, Domino's Pizza LLC and Domino's Pizza Distribution LLC, Cracker Barrel Old Country Store, Inc., CBOCS Distribution, Inc., Barbeque Integrated, Inc. d/b/a Smokey Bones Bar & Fire Grill, Shamrock Foods Company, United Food Service, Inc., Sun Ice Cream Finance II, L.P. (f/k/a FIC Restaurants, Inc.), The Johnny Rockets Group, Inc., WZ Franchise Corp., Captain D's LLC, and White Castle Purchasing Co.*

## <u>CERTIFICATE OF WORD COUNT AND COMPLIANCE WITH TYPE FACE AND TYPE STYLE LIMITATIONS</u>

The undersigned, counsel of record for Appellants, furnishes the following in compliance with the type face and type style limitations in Federal Rule of Appellate Procedure 32 and D.E. 4.

I hereby certify that this Statement of Position conforms to FRAP 32(a)(5) and 32(a)(6) and ECF 4 for a document produced with proportionally spaced font. The length of this document is 5,657 words.

/s/ *Lori P. Lustrin*        
Lori P. Lustrin

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that a true and correct copy of the foregoing document was electronically served upon the parties and counsel of record on April 15, 2025.

/s/ *Lori P. Lustrin*        
Lori P. Lustrin
